# The Commonwealth *against* James Clark.

The Act of the 18th April 1843 authorizing the election of canal commissioners is constitutional and valid.

*QUO WARRANTO,* directed to James Clark, William B. Foster, Jun., and Jesse Miller, canal commissioners of Pennsylvania.

Be it remembered that at a Supreme Court held at Harrisburg, in and for the Middle District of Pennsylvania, on the 21st day of May, in the year of our Lord 1844, comes Ovid F. Johnson, Attorney-General of the said Commonwealth, and on behalf of said Commonwealth gives the said court here to know and be informed that on the second Tuesday of January last past, to wit, on the 9th day of said month, at the borough of Harrisburg, the seat of government of the Commonwealth of Pennsylvania, James Clark did intrude into and usurp upon the said Commonwealth

the office of canal commissioner of the said Commonwealth, with-
out warrant or lawful authority for so doing.   Whereupon the
said Attorney-General, on behalf of the Commonwealth of Penn-
sylvania, gives the said court here to understand and be informed
that the said James Clark, from and since the 9th day of January
last past, at the borough of Harrisburg aforesaid, and throughout
the Commonwealth of Pennsylvania, has used and exercised, and
still doth use and exercise, the office of canal commissioner of said
Commonwealth, without any warrant or lawful and constitutional
authority therefor: which said office, and the powers, authorities,
emoluments and franchises thereto belonging and appertaining,
the said James Clark during all the time aforesaid hath usurped,
and still doth usurp upon the government of the said Common-
wealth, to the great damage and prejudice of the lawful authority
of the same.   Wherefore the said Attorney-General makes sug-
gestion and complaint herein, and for due process of law against
the said James Clark in this behalf to be made, to answer by what
warrant he claims to have, use, exercise and enjoy the said office.

And now, viz., on the 4th day of June 1844, the said James
Clark comes here into court, and by James M'Cormick, his attor-
ney, protesting that he, the said James Clark, did not intrude into
and usurp upon the said Commonwealth the said office of canal
commissioner without a warrant or lawful authority, as in the
said suggestion of the Attorney-General is set forth; for his an-
swer and plea in this behalf saith that in pursuance of the provi-
sions of the Act of Assembly of this Commonwealth, passed on
the 18th day of April 1843, entitled "An Act to reduce the
expenses and provide for the election of the Board of Canal
Commissioners," he, the said respondent, was at the annual
election, held on the 9th day of October 1843, duly elected
one of the canal commissioners of this Commonwealth by the
qualified voters of the several counties thereof, and on the 7th
day of November 1843 the Secretary of the Commonwealth, on
the receipt of the returns of the said election, did in due form of
law notify the said respondent of his said election to the said
office of canal commissioner.   That afterwards, viz., on the second
Tuesday of January 1844, at Harrisburg, in the said Common-
wealth, he the said respondent, under and by virtue of the provi-
sions of the said Act of Assembly, being first duly sworn accord-
ing to law, did enter upon the duties of the said office of canal
commissioner of this Commonwealth, and hath continued from
thence hitherto continually to use, exercise and perform the said
office of canal commissioner, as he was authorized and bound to
do according to the constitution and laws of this Commonwealth.
Without this, that the said respondent hath usurped and still doth
usurp upon the said Commonwealth in the manner and form as by
the said suggestion is supposed.   All which the said James Clark,
the respondent, is ready to verify, &c.   Wherefore he prays judg-

[The Commonwealth v. James Clark.]

ment, and that the said office of canal commissioner of this Commonwealth may be allowed and adjudged to him, and that he may be dismissed from the premises in the said suggestion charged against him, &c.

And thereupon O. F. Johnson, Attorney-General of the Commonwealth, who prosecutes for the Commonwealth on this behalf, comes and saith that the said answer of the said James Clark, and the matter therein contained in manner and form as the same are above pleaded and set forth, are not sufficient in law to bar or preclude the said Commonwealth from having or maintaining the aforesaid proceeding thereof against him, the said James Clark, and the said Commonwealth is not bound by law to answer the same; and this the said Commonwealth is ready to verify. Wherefore, for want of a sufficient plea in this behalf, the said Attorney prays judgment for the said Commonwealth, and that the said defendant be ousted and altogether excluded from the office of canal commissioner of Pennsylvania.

And the said O. F. Johnson, Attorney-General, according to the form of the statute in such case made and provided, states and showeth the court the following cause of demurrer to the same plea:

1. That the election held on the 9th day of October 1843, in pursuance of the alleged Act of Assembly of the 18th April 1843, entitled "An Act to reduce the expenses and provide for the election of the Board of Canal Commissioners," gives no right to the said James Clark to hold, exercise and enjoy the said office of canal commissioner of Pennsylvania—the said Act of Assembly being wholly unconstitutional and void, and the said election without lawful authority and a nullity; and he, the said James Clark, could not under such authority exercise the duties of the said office.

Joinder in demurrer.

*Watts* and *Attorney-General Johnson*, for the Commonwealth.
*Miller*, in propria persona, and *M'Cormick*, for respondents.

The opinion of the Court was delivered by

Gibson, C. J.—It is unnecessary to advert to the common-law definition of an office, or to the supposed distinction between offices in the appointment of the executive, and offices within the power of the Legislature by the original constitution. The question for decision turns on the peculiar provisions of the amended constitution, and it lies within almost the bounds of a nutshell. The eighth section of the sixth article declares that "All officers whose election or appointment is not provided for in this constitution, shall be elected or appointed as shall be directed by law." The election or appointment of canal commissioners was not provided for by the constitution, and it was consequently to

VII. — 17

[The Commonwealth v. James Clark.]

be provided for by law.  But it was declared by the schedule appended to the instrument (section 11), that "The appointing power shall remain as heretofore; and all officers in the appointment of the executive department shall continue in the exercise of the duties of their respective offices, until the Legislature shall pass such laws as may be required by the eighth section of the sixth article of the amended constitution; and until appointments shall be made under such laws, unless their commissions shall be superseded by new appointments, or shall sooner expire by their own limitations; or the said offices shall become vacant by death or resignation."  Now, the canal commissioners were officers within the appointment of the executive at the adoption of the amendments, and consequently were to remain in office till laws for elections, or new appointments, should be enacted.  But the same section of the schedule directed those laws to be enacted by the first Legislature under the amended constitution.; and as the injunction was not performed by it, the argument on the part of the Commonwealth is that it could not be constitutionally performed by a subsequent one; of course, that the power of appointment remains with the executive.

The authority invoked for this interpretation is the decision of this court in *The Commonwealth* v. *Leib*, (9 *Watts* 200), in which it was held that the execution of a power by the first Legislature, as directed by another section of this same schedule, could not be repeated by a subsequent Legislature on pretence that the preceding one had not carried out the views of the convention.  The ninth section had directed the first Legislature to divide the associate Judges of the Common Pleas into classes, in order that they might be displaced in turn, according to seniority of commission, in a certain number of years.  The classification was made, but the second Legislature undertook to remodel it on the ground of mistake; and this it was held incompetent to do, not only because the power was a discretionary one, vested in a particular body, which was to judge of the exercise of it, but because it had already been exhausted by the execution of it, and was gone.  Being executed, it had become obsolete and incapable of giving authority for further action.  What conclusively showed that the exercise of it was limited to the first Legislature was, that subsequent legislation would have come too late for the object; for, when the second Act was passed, the period for the expiration of the commissions of the first class had already elapsed.  How different the case before us, in which the power to enact laws for the introduction of the particular amendment had not been executed at all, and in which the power is not such as must necessarily be exhausted by a single exercise of it!  It was a cardinal object of the convention to place the appointment to office, and the patronage consequent upon it, in such hands as the Legislature should from time to time direct; not to have a final disposi-

tion of it by the accidental action of any one Legislature. The purpose of subjecting it to legislative action at all, was to have the benefit of changes which experience might from time to time show to be expedient. But the power of the Legislature over the classification of the associate Judges was necessarily limited to a single exercise of it; and the act, being done, could not be repeated. It would have been a curious, but by no means an amusing spectacle, to see a class of those Judges, who had retired from the bench under a particular classification, recalled to it and their successors expelled, by the establishment of a new one according to the alternate prevalence of parties in the political arena.

To have applied the principle of *The . Commonwealth* v. *Leib* to cases of a different stamp, might have led to startling consequences. By the seventh section of the sixth article of the amended constitution, " Justices of the peace and aldermen shall be elected in the several wards, boroughs or townships, at the time of the election of constables, by the qualified voters thereof, in such numbers as shall be directed by law, and shall be commissioned by the governor for a term of five years;" and by the twelfth section of the schedule, " The first election for aldermen and justices of the peace shall be held in the year 1840, at the time fixed for the election of constables. The Legislature, at its first session under the amended constitution, shall provide for the said election, and for subsequent similar elections. The aldermen and justices of the peace now in commission, or who may in the interim be appointed, shall continue to discharge the duties of their respective offices until fifteen days after the day which shall be fixed by law for the issuing of new commissions, at the expiration of which time their commissions shall expire." Now, on the principle of construction asserted by the Commonwealth, what would have been the consequence if an accidental difference of views between the Senate and the House of Representatives, such as actually occurred in regard to the canal commissioners, had prevented the first Legislature from enacting laws to carry the ulterior provisions of the constitution for the election of aldermen and justices of the peace into effect? . It would have been the frustration of those provisions, and the perpetuation of the old mode of their appointment, with its attendant principle of tenure for life, and with the preservation of a great share of the executive patronage, which it was an especial object of the convention to destroy. That is not all. Though the justices and aldermen would have held their commissions for life, there would have been no power under the constitution to supply their places at their death; and thus this indispensable arm of the magistracy would in the end have been cut off. The eleventh section of the schedule, which provided that the appointing power should remain as theretofore, was predicated of offices indicated in the eighth sec-

[The Commonwealth v. James Clark.]

tion of the article; for it is restrained to officers in the appointment of the executive, whose election or appointment is not provided for in the amended constitution. It was said, in regard to these, that they should continue to exercise their functions till the Legislature should pass such laws as might be required to give effect to the eighth section of the sixth article; and it was consequently in relation to the offices indicated in that section that it was said the power of appointment should remain as theretofore. If that provision were an independent and unrestricted rule of the constitution, it would annul all the alterations for appointment to office, either by the executive or by the Legislature; but it was expressly restricted to officers whose election or appointment is not specially provided for by the terms of the amended constitution. Now, the election of justices and aldermen happens to be thus provided for in the body of the instrument; and it is therefore not within the conservative operation of the eleventh section of the schedule. Can it be thought, then, that by directing laws for the election of justices and aldermen to be enacted at the first session, the convention meant to expose one of its most cherished alterations, and an entire branch of the magistracy, to the chance of destruction from the uncertain action of the Legislature? Perhaps nothing conduced more to the success of the amendments than public clamour against the inferior magistrates; and though it may be entirely true that the quality of these officers has not in any great degree been improved by the change, it is certain that a change was called for by the public, which is all that is required for the argument. The principle of strict construction would frustrate important provisions in every newly constructed frame of government. It was provided by the first article and third section of the federal constitution, that the Senate should be composed of two members from each State, chosen for six years; and that "*immediately*" after they should be assembled they should be divided into three classes, in order that one-third of the body might be chosen every year. Yet, on the principle of strict construction, a postponement of the division for a month or a day would have presented an insuperable obstacle to the organization of the government. Necessarily, the paramount rule of interpretation demands that such provisions be deemed only directory, as was the injunction imposed by the seventh article of our constitution, which has been retained by the reform convention, that " the Legislature shall, as soon as conveniently may be, provide by law for the establishment of schools throughout the State, in such manner that the poor may be taught gratis." Yet, though it was just as convenient to perform this duty at first as at last, it was not done till half a century had elapsed, and no one doubts for that reason the constitutionality of our system of public schools.

Still further. If the power of appointment remains with the

executive, it must be because it was vested in him by law at the adoption of the amendments: and it must be exercised in the mode prescribed by the law, without confirmation by the Senate, though it was evidently intended that no executive appointment by virtue of the constitution should be valid without such confirmation, except that of Secretary of the Commonwealth. Thus would not only the power to appoint canal commissioners remain as it was, but also the power to appoint all officers whose appointment is not specifically provided for in the amended constitution; and thus, too, would the principal part of the executive patronage be restored by an accidental difference of views between the branches of the first Legislature. That difference would have the effect, too, of engrafting on the original constitution a power of appointment which originated in an act of ordinary legislation, and this, too, without submission to or adoption by the people.

A constitution is not to receive a technical construction, like a common-law instrument or a statute. It is to be interpreted so as to carry out the great principles of the government, not to defeat them; and to that end, its commands as to the time or manner of performing an act are to be considered as merely directory wherever it is not said that the act shall be performed at the time or in the manner prescribed, and no other. The object of the command, in this instance, was no more than to urge the Legislature to put the elective principle in active operation at the earliest day practicable under all the circumstances, and it has been accomplished. What is this schedule? It is a temporary provision for the preparatory machinery necessary to put the principles of the amendments in motion without disorder or collision. Its purpose was not to control those principles by the happening of an event, but to carry the whole into effect without break or interval. Its use was merely to 'shift the machine gradually into another track, and, having done its office, it was to be stowed away in the lumber-room of the government. Nothing was further from the purpose of the convention than to make anything contained in it a matter of permanent regulation. Its uses were temporary and auxiliary. To suppose that the provisions in the eighth section of the sixth article were to depend for their effect on the sanction or co-operation of the first Legislature, would be to suppose that it was intended to give that body a controlling power over the public will expressed by the adoption of the amendments. It would have been an abuse of the power which the convention had received from the people to delegate any part of it, except for merely ministerial purposes, and especially to delegate it to a body whose action would be final. It is impossible for human forecast to provide against accidents which may stop the motion of an untried machine; and they must be repaired, when they occur, by those who have the management and direction of it. The convention could not foresee the difference which took place

between the Senate and the House of Representatives in the first Legislature; and the great elective principle established in the body of the constitution must not be suffered, for that reason, to fail. It is considered, therefore, that the demurrer of the Commonwealth be overruled; that the plea of the respondents be sustained, and that they go without day. ·