MILES PRICE, URIAH BOWDEN, HENRY HOWELL AND WILLIAM J. HALL, APPELLANTS, vs. SAMUEL A. WINTER, APPELLEE.

1. It is essential to the validity of the sale of the interest of an infant in the estate of his ancestor that the court making the sale should so far conform to the statute regulating the proceeding as to acquire jurisdiction of the subject matter and the parties. Over the inheritance of an infant the Legislature has plenary power. It can prescribe the method by which jurisdiction of the infant can be acquired, and conformity to this requirement is all that is necessary.

2. In proceedings for the sale of the lands of a decedent, the statute of this State does not require the service of process upon an infant heir or

Price et al. v. Winter.

devisee in order to acquire jurisdiction. The statute requires the court to appoint a guardian for such of the heirs or devisees as are infants, and this is essential.

3. Where service of process is made upon the general guardian of the infant, he appears and makes the defence required by the statute and is heard by the court as the representative of the infant, such action is equivalent to his appointment as guardian *ad litem*.

4. A sale of the land of a decedent under such proceedings is a judicial sale. If the court has jurisdiction of the subject matter and the person, a purchaser at such sale cannot be affected by irregularities or errors in the proceedings. Such errors may be corrected upon appeal. They cannot be corrected in a collateral proceeding.

5. An executor will not be permitted to hold an interest acquired through a purchase at his own sale. If, however, a third person is interested in such bid, a court of equity should not set aside the sale as to this third person in a case where the sale was by commissioners for full value and there was no fraud in fact.

6. Where there has been a sale of an infant's interest in the estate of his ancestor, and the infant after his majority has knowingly received the amount representing his interest from the party that he is aware made the purchase and claimed title to his interest in the estate, such person so receiving such amount has no equity to recover of the purchaser any portion of the estate for which he has received an equivalent.

This action was instituted in the Circuit Court of the Fourth Judicial Circuit for the county of Duval by Samuel A. Winter, one of the devisees under the will of his father, James Winter, who died in February, A. D. 1857. The will directed a division of the land in kind among the children, share and share alike, in case a fair and equal division in kind could be made. In the year 1857, James L. Winter, the executor, filed his petition under the statute of this State in the Circuit Court for Duval County, alleging that the land so devised could not be equally, fairly and beneficially divided, and praying authority to sell and convey the land, and to make distribution of the proceeds among the parties entitled under the will. The petition set forth the interests of the several parties, and Samuel A. Winter, the plaintiff in this action, at that time an infant, was named therein as one of the children of the testator having an

equal interest under the will. A sale was ordered and the defendants, Miles Price, Henry Howell and William J. Hall, were purchasers at said sale.

The plaintiff in this action seeks to set aside the sale and have a partition of the land.

The Circuit Court adjudged the sale void as to the plaintiff, and entered a judgment directing a partition of the land, and the setting aside of his share to the plaintiff.

This appeal is prosecuted from that judgment. The grounds of the action of the court below and the pleadings essential to the understanding of the case as made in that court, and as reviewed by this court, and the errors here assigned, are fully stated in the opinion of the court.

*J. J. Finley* for Appellants.

It is contended by the appellee, who was plaintiff in the court below, that he is not bound by the said proceeding, nor the decree rendered therein, nor by the sale of the commissioners made thereunder:

1. Because the court did not appoint a guardian *ad litem* and order a citation to issue to said guardian.

2. Because Frederick Von Santen, the guardian of the plaintiff below, was of kin to the petitioner, James L. Winter.

3. Because of fraudulent collusion between Miles Price, the appellant, and Frederick Von Santen, the guardian of the appellee.

1. It is contended by the appellee that Frederick Von Santen was his *statutory* guardian, and not his guardian *ad litem*, and that therefore the appellee was not properly before the court in the proceeding to sell the real estate for division.

The Circuit Court of Duval County, before whom said proceeding was had, was, and is a court of *general jurisdiction*, and, therefore, according to a well-known principle of law, all the presumptions are in favor of its having exercised a rightful jurisdiction, until the contrary is shown, and the

Price et al. v. Winter.

burthen of proof lay on the plaintiff below to rebut the presumption, which he did not do.

It was incumbent on him to have produced at the hearing in the court below a certified copy of the record of the proceeding for the sale of the land for division, with the certificate of the clerk under seal of the court, that said copy contained *all the record in the case*, which was not done.

Having failed to do this, the presumption arises that the court exercised a rightful jurisdiction, not only of the subject matter of the suit, but also of the person of the appellee, and it is contended that this presumption is not rebutted by any proof appearing in the record.

But even if the soundness of the foregoing proposition should be doubted, it is insisted for the appellants that the act of March 4, 1841, under which the proceeding was had, was substantially complied with.

The general principle, so well established, that "an infant is the ward of Chancery," is in substance re-affirmed in the act of March 4, 1841. Thomson's Dig., sec. 7, chap. 7, page 204.

I think the fair and reasonable interpretation of the said act is, that in the proceedings therein authorized, the court has jurisdiction of the person of the infant without bringing him before it by the service of process upon him, and simply required the appointment of a guardian to whom citation should issue, and who should appear and put in an answer for the infant, denying all the allegations in the petition, so that nothing should be taken for confessed as against the infant. And the only limitation placed on the power of the court to select and appoint such guardian is, that he shall not be the petitioner, or of kin to the petitioner, or his attorney or agent.

Now it is contended that the action of the court in ordering citation to be served on the guardian (Von Santen) was in substantial compliance with the statute, which requires the court in such case "forthwith to appoint guar-

dians of such of the devisees as are infants to answer and defend against said petition."

In this case, all the purposes and objects of the act have been fairly, faithfully and fully accomplished.

1. Frederick Von Santen was the guardian of the minor.

2. It was ordered by the court that he should be cited as guardian.

3. The citation was duly served on him.

4. He put in the answer for the ward, denying all the allegations in the petition.

5. An examiner was appointed and proof was taken on the issue made by the answer.

6. Upon full consideration, it was decreed by the court that the real estate mentioned in the petition should be sold for division.

7. Commissioners were appointed to make such sale, and said sale was made under the said decree, after due notice given.

8. The sale was regularly reported by the commissioners appointed to make it.

9. And the report of the commissioners, and the sales made by them, were duly confirmed by the decree of the court.

From this, it will appear that all the requirements of the act were complied with, that the court carefully guarded the infant's interests, and that it did in this case, as it will in all cases where it may be necessary, appoint a guardian to watch and protect his rights. Cavander vs. Smith, 5 Clarke (Iowa) 159.

If substantial justice has been done, a judgment or decree will not be set aside for mere irregularity, upon a suit instituted for that purpose thirteen or fourteen years after such judgment or decree was rendered; nor when such suit is instituted by an infant some nine or ten years after he arrives at full age.

That Frederick Von Santen, the guardian of the appellee,

was not of kin to James L. Winter, the petitioner, I cite : 1 Bouvier's Law Dictionary, 778.

Another ground urged by the plaintiff (appellee) why the decree and the sale thereunder should be set aside is that the same was fraudulent.

It is a well established principle in the jurisprudence of this State that "fraud will not be presumed, but must be proved." Wilson & Cleland vs. Lott, 5th Fla. R. 305 ; White vs. Walker, 5th Fla. R. 478.

In this case inadeqacy of price cannot be relied on as an evidence of fraud, because the proof shows that the amount for which the land in question was sold was its full value at that time.

Besides, this was a judicial sale, and when such sale is public and fair, it may be justly presumed that the fair market value is obtained, and there seems no reason to question its general validity, but it should be specially impeached. 1 Story's Eq. Jurisp., sec. 346.

It is a significant fact that nowhere in the plaintiff's bill has it been alleged, nor has it been attempted to be proved that the price for which the land sold was less than its value, but on the contrary, it was shown that it brought its value.

In the 10th article of the complaint it is alleged " that F. Von Santen being a kinsman, relative, and of kin to the petitioner, James L. Winter, and also one of the devisees, fraudulently combining with the said James L. Winter, without any authority of law, made acknowledgment of service of citation, and appeared and made a pretended defence to said petition in behalf of the plaintiff."

What is the proof on this point ?

1. It appears from the evidence as it is found in the record, that Von Santen, without seeking it, and without even a suggestion from James L. Winter, was ordered by the court to be cited as the guardian of the plaintiff to answer the petition.

2. It was under the compulsory order of the court that he made his answer to the petition.

3. His answer denied all the allegations in the petition, and thereby put them in issue.

Thus it will be seen that there is not one particle of proof in the whole record of any combination, or even a suspicion of combination, fraudulent or otherwise, between Von Santen and James L. Winter, and it stands out upon the record a bald and naked allegation, without even the pretence of proof.

The next and only other allegation of fraud is made in the 12th clause of the complaint, wherein it is alleged that Miles Price, (one of the appellants,) through his fraudulent representations to the commissioners, induced them to execute a deed to the " Dell's Bluff tract to Uriah Bowden."

We search the record in vain to find any proof to sustain this charge.

The proof is—

1. That Price authorized Bowden to bid in the " Dell's Bluff tract for him."

This he had a right to do, and the proof shows that the sale was open and fair.

2. That Bowden bought the land for Price.

3. That Bowden thought the bid was put down to Price, but when he found the deed was made to him, he in good faith conveyed to Price.

4. That Price paid for the land.

The above is the evidence on this point; and as there is no proof whatever that Price made any fraudulent representations to the commissioners to procure them to make the deed to Bowden, the allegation in the bill is wholly unsustained.

See the answer of Emory (one of the commissioners) to the 5th interrogatory, which does not warrant even the suspicion of fraud.

It will be seen, from a complete examination of the testi-

mony in the record, that there is an *utter failure* to prove a single fraudulent act charged in the bill.

The sale was made under the decree of a court of competent and general jurisdiction; the proceedings, decree and sale were, according to the proof, entirely free from fraud; no advantage was taken of the inexperience of the minor, and there was no attempt to overreach him or to take advantage of his inconsiderateness.

But it is contended for the appellants that even if the proceedings for a sale of land for division shall be held to have been irregular, the appellee ratified and affirmed the same long after he came of age; and to this point I will now address the argument.

Assuming that the sale of the land in this case, as made by the commissioners, so far as the question of infancy is concerned, will be substantially governed by the same legal principles as if he had sold his interest during his minority, I respectfully submit the following propositions and authorities:

The tendency of the modern decisions is in favor of the policy of the rule, that the acts and contracts of infants should be deemed *voidable only*, and subject to their election when they came of age, whether to affirm or disavow them. 2 Kent Com. Marg. p. 235.

Where the contract is merely voidable, it seems, upon general principles, capable of confirmation. 1 Story's Eq. Jurisp., sec. 345 and note (2.)

If any act of confirmation be requisite after he comes of age to give binding force to a voidable act by his infancy, *slight* acts and circumstances will be a ground from which to infer the assent. 2 Kent Com. Marg. p. 237.

And so in the case of Wheaton vs. East, 5 Yerger's Rep. 41, the decision was, that a deed of confirmation of the minor's deed was not requisite; but that any act of the minor when of age, from which his assent might be inferred,

would operate as a confirmation, and would conclude him. 2 Kent Com. Marg. p. 238, note (b.)

A sale of lands received during infancy for other lands is a confirmation of the original deed of conveyance. 2 Kent Com. Marg. p. 238, note (3,) citing Williams vs. Mabee, 3 Halsted Ch. 500.

And his confirmation of the act or deed of his infancy may be justly enforced against him after he had been of age for a reasonable time, whether from his positive acts in favor of the contract, or from his tacit assent under circumstances not to excuse his silence. 2 Kent Com. Marg. p. 238.

It was the plaintiff's duty, on his discovering that the land had been sold under the decree, to have taken immediate steps, when he arrived at full age, to set aside the sale; and it is contended, that by receiving from Price the consideration for his interest in the proceeds of the sale of the lands nine years after he came of age, he ratified the sale made by the commissioners under the decree, and is forever estopped. Southern Life Ins. & Trust Co. vs. Lanier, 5 Fla. Rep. 159.

And so in the case of Curten vs. Patten, 11 Sergt. & R. 205, the court held, that some distinct act by which the infant received a benefit from the contract after he came of age would be sufficient to make a valid confirmation; and in this case it is to be observed that the contract was considered void. 2 Kent Com. Marg. pp. 238 and 239.

A person may, after full age, confirm any *erroneous judgment* rendered against him while a minor, without the appointment of a guardian *ad litem.* 3 Mass. Dig., p. 422, No. 9.

There are cases in which it has been held, that even a silent acquiescence for a considerable length of time by an infant after arriving at full age, is itself a ratification of his conveyance, and especially when he looks on and permits the purchaser to make improvements. 20 U. S. Dig., 529, citing 20 Ark. 600.

In this case the acquiescence of the plaintiff continued for a longer period than would be necessary to form a statutory bar.

The plaintiff attained his majority in 1862, and did not institute this suit until the latter part of 1871. Voorhees vs. Voorhees, 24 Barb. (N. Y.) p. 150.

A compromise of a suit in equity, made by a guardian, sustained by a chancellor, and approved by the Probate Court, will not be set aside upon the application of the infant after he has come of age, without good cause shown. Dunlap vs. Petrie, 35 Miss. 590.

If the infant, after he arrives at full age, is possessed of the consideration paid him, whether it be property, money, or choses in action, and either disposes of it, so that he cannot return it, or retains it for an unreasonable length of time, it will amount to an affirmation of the contract. Manning vs. Johnson, 26 Ala. Rep. 446 ; 1 Story's Equity Jurisprudence, Section 240 ; Young's Adm'r. vs. McKinnie's Adm'r. 5 Fla., p. 553.

The infant's privilege of avoiding acts which are matters of record, is much more limited in point of time than his privilege in avoiding matters *in pais*. 2 Kent marg. p. 237 ; Tucker et al. vs. Moreland, 10 Pet. Rep. 58.

*Fleming & Daniel* on the same side.

Appellants' counsel submit that—

1. If the court had jurisdiction of the subject matter of the petition ;

2. If the plaintiff was a party to the proceedings and properly before the court ;

3. If the decree and sales thereunder are not set aside for fraud ;

Then the decree of Judge Putnam is conclusive as to the plaintiff's right, and the court had no power to set aside the sales made thereunder.

" The judgment of a court having jurisdiction of the sub-

ject matter is conclusive between the parties, unless reversed or set aside for fraud." 1 McLean, 460.

We assume that all of the presumptions are in favor of the proper exercise of its powers by courts of general jurisdiction.

"The decision of a competent court will be presumed to be according to law until the contrary is proved." Wade vs. Dick, 1 Iredell Ch., 323.

The record of a court of limited jurisdiction must show that jurisdiction was rightfully exercised, but in courts of general jurisdiction it will be presumed. Grignon vs. Astor, 2 How. 319, 343; Kemp vs. Kennerdy, Peters' C. C. Rep., 30.

"Every reasonable presumption is to be made in favor of the judgment or decree of a court of general jurisdiction." 2 Wallace, 328, 341; 5 McLean, 167.

That the subject matter of the petition was within the jurisdiction of the court is apparent, and we presume will not be denied.

Was Samuel A. Winter a party to the proceedings before Judge Putnam on the petition of James L. Winter, executor, and properly before the court?

The court is charged by the statute with the proper and discreet care of the infant's rights. The statute vests in the court jurisdiction of the infant as a party to the proceedings as soon as the petition is filed, and by virtue of such filing, as completely as it does of the adult heirs when properly cited and brought into court. No citation of the infant is required. He is before the court by operation of the law.

The court is not to appoint a guardian to appear for the infant as required by the statute of New York, cited in the case of Bloom vs. Bendick, 1 Hill's Reports, page 140, relied on by plaintiff's counsel in the argument of this cause before the Circuit Judge.

The court is directed to appoint guardians to such of the heirs or devisees as are infants, to answer and defend against said petition.

Before an answer can be filed or a defence made, the party must be before the court.

In the ordinary practice of the courts, the infant would first be served with notice. This is the first step, and brings the infant before the court.

An order is then made on the proper application appointing a guardian to answer and defend for the infant in the matter before the court.

The appointment of the guardian to answer and defend presumes that the infant is before the court and under its jurisdiction by operation of the law.

The jurisdiction over the person of the infant does not attach from the act of appointing the guardian. That act is a consequence of the jurisdiction which has already attached by the operation of the statute and one step only in the proceedings in the cause.

"Any movement by a court is necessarily the exercise of jurisdiction."

The power to hear and determine a cause is jurisdiction; it is *coram judice* whenever a case is presented which brings this power into action. 2 Howard, 338; 6 Peters, 709; 12 Peters, 718; Ibid., 623; 3 Peters, 205.

If jurisdiction over the person as well as of the subject matter of the petition attached, then it is not competent for the court to enquire whether mere errors or irregularities exist in the proceedings on which the order of sale was made.

The errors of the court, however apparent, can be examined into only by appellate power. 10 Peters, 450, 472.

A decree in partition cannot be examined into in a collateral action to see whether errors and irregularities exist in the proceedings. Parker vs. Kane, 22 Howard; 14.

"An order for the sale of a decedent's real estate granted by a Probate Court, is conclusive as to the necessity and propriety of the sale, if the facts necessary to confer jurisdiction appear on the face of the proceedings." 3 Wallace, 396, 406.

When a court, from its general powers, has jurisdiction of the subject matter, a due notice served on the party, if the proceedings be in *personam*, or an attachment laid on the lands, if the proceedings are *in rem*, gives jurisdiction, and after this attaches no proceedings in the subsequent stages of the case, however erroneous, will make them void. 4 McLean, 449 ; 1 McLean, 224.

" The purchaser of lands sold under the decree of " a court of competent jurisdiction, is not, in a collateral suit, affected by any errors or mistakes in the proceedings." 2 Peters, 157 ; 5 McLean, 148.

The court does not enquire into the regularity of the proceedings in courts of co-ordinate jurisdiction. Platt vs. Cadwell, 9 Paige C. C. R., 386.

The jurisdiction of a court can never depend upon its decision upon the merits of a case brought before it, but upon its right to hear and decide it at all. 7 Peters, 572.

There is no principle of law better settled, than that every act of a court of competent jurisdiction shall be presumed to have been rightly done till the contrary appears. 10 Peters, 449.

The principle is too well settled, and too plain to be controverted, that a judgment or decree by a competent tribunal against a party having actual or constructive notice of the pendency of the suit, is to be regarded by every other co-ordinate tribunal, and that if the judgment or decree be erroneous, the errors can be corrected only by a superior appellate tribunal. 4 Peters, 470.

The errors and irregularities of any suit are to be corrected by some direct proceeding either before the same court to set them aside, or in an appellate court. 2 Peters, 157.

In the case at bar, it is contended that the plaintiff is not bound by the decree of Judge Putnam, because—

1. There is no order appointing a guardian to answer and defend.

2. Frederick Von Santen, who is the brother-in-law of the petitioner and statutory guardian for the plaintiff, answers for his ward.

We submit, in the first place, the court having jurisdiction of the parties and the subject matter, that under the decisions which have been cited, this court cannot enquire whether or not these errors or irregularities occurred or exist.

But grant that these are proper questions for this court to consider, we hold further, that there is no proof before the court that there was not an order made in due compliance with the technical requirements of the law appointing Frederick Von Santen to answer and defend for his ward.

The presumption is unavoidable from the authorities cited, that such an order was made by the court, for the court was one of general jurisdiction and all the presumptions are in favor of the regularity and propriety of the proceedings of such a court until the contrary be proved.

But it is claimed that Von Santen, having married the plaintiff's sister, was "of kin," and therefore incompetent under the statute to act as guardian in the proceedings before Judge Putnam.

We hold that only in a loose and general sense can the term "of kin" be construed to include one who is simply connected by marriage. The true legal signification of the term is relationsip by blood or consanguinity, not that kind of relationship which results from marriage, and which is known as affinity. Bouvier's Law Dic., title "Kindred;" Burrell's do., title "Next of Kin."

It was in this sense that the Legislature used the term.

In this case, by the terms of the will, Von Santen could have no possible interest in the property.

If there is a doubt as to the intention of the Legislature in the use of the term, the benefit of the doubt, at this late day, should certainly be cast in favor of the legality and propriety of the proceedings on which the order of sale

was made. But even though "of kin" was intended to include relations by affinity as well as consanguinity, this court cannot interfere to set aside the proceedings because of this *irregularity*, as has been abundantly shown by the authorities cited above.

We have shown that the court had jurisdiction of the person of the infant by the operation of the law; that Von Santen was cited by the court to answer for his ward; that he did so in substantial compliance with the statute; that full and elaborate proof was taken and every possible precaution adopted by the court to protect the rights of the infant. No substantial defence of the infant is omitted; no substantial right of the infant is defeated.

"When, on sale of the estate of infants by their guardian, the statute regulating such sale was not complied with in many points, and a writ of error to set aside such sale was not presented until such sale was completed by payment of the purchase money and a conveyance, and no substantial object of the statute or interest of the ward was defeated, it was held that the sale would be affirmed." 9 Dana, 526.

But the plaintiff charges fraud and relies upon this as an additional ground to set aside the decree of Judge Putnam and the sales thereunder.

There are but two grounds upon which this charge can be sustained:

1. Collusion between the *purchasers*, the *petitioning executor* and the *statutory guardian, Von Santen.*

2. Constructive or legal fraud arising from an alleged interest of the executor, James L. Winter, in the purchase.

"Fraud is not to be presumed, but must be proved." 5 Fla., 305, 478.

"It is not the policy of the courts to enlarge the catalogue of legal frauds." 2 Stewart, 51, 52.

There is nothing in the testimony to connect the guardian, Von Santen, in anywise with the purchase by Bowden, and the other purchasers at the commissioners' sale.

Let us see, now, what proof is produced to establish collusion between the petitioning executor, James L. Winter, and the purchasers at the commissioners' sale.

The evidence on this point resolves itself into the statement made by Emery in his answer to the seventh cross-interrogatory, that he understood that Miles Price and James L. Winter were desirous of purchasing the Dell's Bluff tract, while Bowden and Price both testify distinctly that he purchased for Price alone and at his sole instance and request. J. N. Haddock also admits that James L. Winter was to have an interest in the Alachua tract.

Now, while this testimony may go to show that James L. Winter desired to take an interest in the Dell Bluff and Alachua tract, it appears further, that in fact he had no share or part whatever in the purchase of either, never having paid one cent of the purchase money, nor received any part of the title or estate. But even though he had done so, the court will not construe the law to prevent the executor, being an heir, from bidding on equal terms with other heirs at a judicial sale of the lands of his testator, the sale being made by a commissioner, and not by himself. And even though he had purchased the lands at his own sale, we hold that if the property brought its full value, and there is no fraud proven, the court will not set the sale aside. It is true that the English decisions and some of the American are in favor of an extended application of the rule that executors and administrators cannot purchase at their own sales—(not, however, that this was a sale made by commissioners appointed by the Circuit Court; that the matter was taken wholly out of the hands of the executor who had no other or greater connection with the sale than any of the other heirs, nor is it to be presumed any greater knowledge of the character and value of the property.) These decisions are, however, generally based upon a different state of facts than those at bar. As will be noticed, they have been usually made by the executor or administrator in his official

capacity, without special authority; hence the necessity for the rule. 2 Stewart, 51.

It is the policy of the law to narrow the catalogue of legal frauds. Ib., 52.

The inference deducible from these decisions is that an administrator, when he has an interest in the estate, may purchase, but, when he has a mere naked trust, he cannot. 2 Stewart, 52.

"An administrator, entitled to a share in the estate, may lawfully purchase to the extent of his interest." 2 Williams on Ex., p. 801, note.

There is no proof in the case at bar that James L. Winter even proposed to purchase more than the extent of his interest in the lands as one of the devisees under his father's will.

In the case of Brannan and others vs. Oliver, (2 Stewart's Reports,) to which the court is specially referred as affording a remarkably clear and concise summary of the law on this subject, the Supreme Court of Alabama say, in closing:

"This course of reasoning has brought my mind to the conclusion that the purchase by the administratrix is *prima facie* valid because divested of all unfairness." 2 Stewart, page 54.

"That the administratrix was herself the purchaser, does not render the sale void." 1 Hill Ch., 461.

"An administrator, selling the personal estate of his testator under the order of the ordinary, is allowed to become a purchaser when he sells fairly and pays the full value." 2 Hill Ch., 405; so also 8 Iredell's Equity, page 201.

"An administrator may purchase at a sale ordered to be made by a commissioner for the payment of debts." Peters' C. C., 365; 2 Mass., 531.

Again:

"A purchase by an administrator not entitled to a share is not absolutely void, but may be confirmed, or set aside at the election of the parties interested in the estate." 2 Williams on Executors, page 801 and authorities cited in note.

Price et al. v. Winter.

In the case at bar, the executor at most only contemplated a possible interest in the purchase; in fact, he derived no interest in estate therefrom, either equitable or legal, and, being dead, can never do so.

The executor was one of the devisees under the will and had an interest in the lands.

The sale was by a commissioner under a judicial order, at public outcry, after due notice, open and fair.

The consideration was ample and just. The sale has been approved by the court and acceded to and confirmed by the heirs themselves.

We can find no fraud here, either actual or constructive, to authorize the court to set aside the sale, or to disturb, in a collateral action, the decree upon which it was made and the solemn order of the court approving and confirming it.

Plaintiff's counsel rely on the case of Michoud and others vs. Girard and others, 4 Howard.

Admit the strength of this case as indicating the opinion of the United States Supreme Court upon the statement of facts therein set forth. The case in 4 Howard is not, however, parallel to the case at bar. In the Michoud case, the purchaser at the sale bid the property off as the avowed agent of and for the executor, who stood by and directed the sale and afterwards took a conveyance of the property and appropriated it to his own use. We consider that the Supreme Court enunciated the old English doctrine much too strongly, but do not consider that this court is at all bound thereby. The reason assigned for their decision by the Supreme Court is, that "*public policy*" requires a rigid adherence to the old rule.

Now, the same court, in the case of Delmas vs. Insurance Company, 14 Wallace, 666, says:

"When a decision" "is made upon the general principles by which courts determine whether a consideration is good or bad on principles of public policy, the decision is one we are not authorized to review; like, in many other questions

of the same character, the Federal courts and the State courts, each within their own spheres, deciding on their own judgment, are not amenable to each other."

While, therefore, the opinion of the Supreme Court of the United States is at all times entitled to great respect and weight when based upon reasons of public policy, it is not to be held as binding upon a State court on a similar state of facts.

But as we have before stated, the case at bar does not assimilate in its character to that in 4 Howard. The executor, James L. Winter, had no connection whatever with the sale, nor with the bidders or bidding at the sale—never paid a dollar upon the property, nor received any title, equitable or legal, to the lands.

"The protection of infants which courts have given, is a shield of defence and is not to be used as a weapon to injure others." 7 Cowen, 179, 181 ; 15 Mass., 359 ; 13 Mass., 37.

And besides, it is only in case of *gross fraud* that courts will entertain an original bill to set the proceedings aside.

"In the case of gross fraud or collusion used in obtaining a decree, the courts will entertain an original bill for the purpose of impeaching it." 1 Daniels' Ch., 167, note and text ; ib., 153 ; 2 P. Wm., 73 ; 3 P. Wm., 111.

Why should the complainant attempt thus collaterally to disturb the solemn adjudication of these questions by a court of competent jurisdiction ?

"In general, however, when no fraud is alleged, (in the case at bar no fraud is proved,) the proceedings to set aside a decree, if it has been signed and enrolled, must be by bill of review, or if not signed and enrolled, by supplemental bill in the nature of a bill of review." 1 Daniels' Ch., 167, note 1.

"If the infant seeks to impeach the decree by showing that he had grounds of defence which were either not before the court or not insisted on at the original hearing, he

may apply to the court for leave to put in a new answer." 1 Daniels' Ch. 107.

"An infant, however, wishing to make a new defence, must apply to the court as early as possible after attaining twenty-one, for if he is guilty of any laches the application will be refused." 1 Daniels' Ch. 162.

If, in the case at bar, the plaintiff has waited too long after reaching his majority, it is his own fault.

Complainant's counsel will argue that Winter did not know the land was sold and purchased by Price, but he had the opportunity of establishing this want of knowledge by his oath, but he did not do it. He dare not swear that he did not know it. He was nineteen years old at the time of the sale, and the presumption is strong, strong as the most positive proof that he did know.

But complainant's counsel attempt to impeach the decree of the Circuit Court in the petition of the executor of James Winter on the ground "that the will directs that the lands be divided in kind, if a fair and equal division can be had of them in that way."

Now this was the very issue before the court. The statute conferred jurisdictiction upon the Circuit Court on petition of the executor to decide whether or not it was necessary to sell the real estate of the decedent in order "to make more equal distribution among the heirs, devisees or legatees." Thomp. Dig., p. 203, sec. 6.

The statute could not have been framed more aptly to meet the language or intent of the will of James Winter. The executor submitted to the court whether or not a "fair and equal" distribution of the lands of his testator could be had without a sale. The court, after a careful, deliberate and legal examination into the facts, decided that a sale was necessary and so decreed.

This court cannot, especially at this late day, reverse the exercise of judgment by the former court in a matter over which under the statute it had full and complete jurisdiction.

But we make the further point that the plaintiff, having voluntarily and with the knowledge of the fact, after reaching his majority, accepted from the defendant, Miles Price, $500 in Jacksonville and Columbia county bonds as his portion of the proceeds of the sale of said lands, is estopped from saying that said sales are null and void, and must be decreed to have confirmed the same.

The decree of a court directing the sale of real estate for the purpose of division between an infant and others, to which the infant was not made a party, is not conclusive upon the infant, so far as such decree undertakes to pronounce upon the extent of his interest, but if he takes under the sales made in pursuance thereof, he may be estopped from saying that the sales are void, for by receiving so much of the proceeds as properly belong to him, he affirms the sale, but is not estopped from contesting the other portion of the decree. 5 Florida, 543; ib., 111.

"The deed of an infant ordinarily is not void but merely voidable." 3 Washburn, 225–6; 10 Peters, 70–1

No contract of an infant is so absolutely void that it cannot be confirmed by the infant at full age. 3 Cranch C. C. R., 276.

There is a well recognized distinction between the nature of those acts which are necessary to avoid an infants' deed and the character of those which are sufficient to confirm it. Such a deed cannot be avoided except by some act equally solemn with the deed itself. But acts insufficient to avoid such a deed may amount to an affirmance of it. Mere acquiescence, though long continued, will not suffice; yet, even that, in connection with other circumstances, may establish a ratification. 9 Wallace, 617.

A sheriff's deed, if valid, is as efficacious to work an estoppel against the claim of an execution debtor as one executed by him voluntarily. Bigelow on Estoppel, 283, note 1.

It appears from the testimony of Miles Price, that during the war he purchased and paid for the distributive shares of

the different devisees under the will in the fund arising from the sale of the real estate of James Winter. The value of these shares severally was fixed at $500 by agreement among the parties, and after consultation with the Probate Judge, who had the custody of the papers of the estate. This testimony is confirmed by the testimony of Aaron W. DaCosta, and also by that of Frederick Von Santen, and is not controverted by any proof on the part of the plaintiff.

It appears further, from the testimony of Miles Price, that he transferred $500 of stock in the bank of St. Johns, at Jacksonville, to Frederick Von Santen, as guardian for Samuel A. Winter, in payment for the residuary interest of the said Winter in his father's estate, including the unpaid instalments on the commissioner's sale of lands.

This testimony is also corroborated by that of Von Santen and not denied by the plaintiff, and so far as the transfer of stock is concerned, it is strengthened by that of J. H. H. Bours, late cashier of the Bank of St. Johns, who shows the transfer to have been made in July, 1861.

Appellant's counsel also introduced the written acknowledgement given by Von Santen to Price at the time of the transfer of this stock.

This bank stock was secured by bonds of the city of Jacksonville and Columbia county to the same amount which were deposited with the Comptroller of the State to secure the issue of the bank.

For authorities to show what acts amount to a ratification by an infant after reaching his majority of his deed or other acts, see authorities cited in brief of Finley and Finley.

For the reasons assigned we hold :

That the sale by the commissioners having been made without fraud under the order of a court of general powers, having jurisdiction of the subject matter and of the person of the infant defendant, now plaintiff in this action—the statute having been substantially complied with, and no defence of the infant omitted or right defeated—is final and conclusive as to the plaintiff's rights in the premises. .

That by accepting from the defendant, Miles Price, ten years after he had obtained his majority, voluntarily and with full knowledge of all the facts, his distributive share of the proceeds of the sale of said lands, the plaintiff ratified and confirmed said sale and cannot now avoid the same.

The court, therefore, erred in setting aside said sale and in the finding of law and fact upon which said judgment is based.

*J. M. & J. H. Baker* for Appellees.

The testimony in this case shows that when proceedings were instituted for the sale of the lands in controversy, Samuel A. Winter was a minor residing in Charleston, S. C., with his regularly appointed guardian, Von Santen, both non-residents, and beyond the jurisdiction of the courts of this State. That the court ordered notice of the proceedings to be given to the guardians of such of the heirs as were minors, Samuel A. Winter and Georgia Winter being the minors. Notices were issued to Von Santen, guardian of Samuel, and to James L. Winter, trustee and guardian of Georgia, who was also the petitioner and brother of Georgia.

It does not appear from the record in the proceedings had for the sale of the lands that any *guardian ad litem* was appointed as required by statute. Thomp. Dig., 204, Sec. 7.

In the proceedings for sale and distribution of the lands of the Winter estate on petition, James L. Winter, executor, the court, in failing to appoint a guardian *ad litem* for the minors, acquired no jurisdiction.

The minors were not legally before the court, and the decision and decree in the case was as to them null and void. 2 Fl., 531; 1 Hill N. Y., 130; 11 Fla., 71.

"When a special authority is conferred even on a court of general jurisdiction, which is exercised in a mode different from the common law, it must be strictly pursued and the record must disclose the jurisdiction of the court." 18 W., 350.

The order to give notice to Von Santen rebuts any presumption of the existence of any order appointing a guardian *ad litem;* the appointment of guardian *ad litem* not appearing of record, notice to Von Santen would not be a compliance with the statute.

1. He was a non-resident, and hence not within or subject to the jurisdiction of the court.

2. Because he was of kin to the petitioner, and under the spirit of the statute he ought not to be entrusted with the defence of the infant.

3. He was the regular guardian and could not represent his ward in the courts. Thomp. Dig., 326, Sec. 4.

The New York statute is similar to the statute of this State and does not require notice to infants in suits for partition. It has been held in that State, that to bind minor's rights by a judgment in cases of this kind, it is necessary to get jurisdiction either by publication, summons, or by appointment of *guardian ad litem.* 1 Hill, 139.

The judgments and orders of courts of general jurisdiction may also be set aside, when they have acquired jurisdiction, by chancery courts for surprise, fraud or unconscionable advantage taken. 12 Fla., —; 1 Story Eq. J., § 252; 2 ib., 1252; 7 Peters, 616.

*Fraud.*—In this case the sale of the real estate under the order of court was void, not only for want of jurisdiction over the minor plaintiff, but also on account of fraud and collusion.

*Evidence of Collusion and Fraud.*—Jams L. Winter, who filed the petition for sale and distribution, was acting executor and trustee under his father's will, which directed a division of the land, the female heirs to have a life estate therein, remainder to their children; the petitioner appointed trustee. See Will, 55, clause 4.

He procured the appointment of Emory, his attorney's clerk, to take the testimony in the partition suit. He also

procured his appointment as commissioner and it appears that he was the acting commissioner.

The petitioner, as guardian and trustee for Georgia Winter, one of the minor heirs, acknowledged service of citation and made answer denying the truth of his sworn allegations in his petition for sale.

That he procured the order for sale for the avowed purpose of becoming a purchaser of the lands himself.

That his attorney, Sanderson, advised him that he could not purchase the lands in his own name, being executor, without violating his oath.

That the only payment made was a pretence and a sham. This was paid by Price, the defendant, to J. L. Winter, his co-purchaser, in the presence of Emory, commissioner, and no receipt given or received, and no evidence that the money so paid was ever paid to the heirs.

The commissioners did not require the terms of sale to be complied with. Hoeg testifies : "I never, at any time, received any money from any of the parties as consideration. I never, at any time, received any bonds, money, notes, or mortgages for or on account of the sale of these lands."

Henry Howell testifies : "I bought the Alachua tract. * * * I did not execute any mortgage for it. I paid nothing on the purchase."

Uriah Bowden testifies : "I did not execute any mortgage to secure the payment of purchase money, or give any note at the time or afterwards." Also, "I did not pay any money when I received the deed after the war from commissioners, nor did I give them any note or mortgage. * * * At the time I executed the deed to Price, no consideration passed from Price to me."

Miles Price testifies : "I don't think I tendered any note or mortgage. I did not sign any to secure other payments."

Emory did not execute deed for the Dell Bluff to Bowden until 1866, and not upon compliance with the terms of sale, but upon Emory's statement that " the relinquishment of

all the heirs and distributors of the estate of James Winter having been first shown the witness."

If any such relinquishment was shown Emory, it was false. Price, the defendant, in his testimony admits that he had no relinquishment from J. L. Winter and Henry Jourdan, who married one of the daughters.

In another place he admits "it was understood between Joseph Haddock and myself that I was to have his share."

Emory signed the deed to Bowden either in collusion with Price or under a mistake and fraud, and without consideration, and Hoeg signed because Emory had signed, who was the only active commissioner. See Hoeg's testimony.

Emory was paid as commissioner one hundred dollars by Price in 1866, the only consideration he received. Emory's testimony.

That procuring a third person to bid off the property when he was acting in the fiduciary capacity of trustee and executor, was a badge of fraud and a disregard of the trust that was confided in him. The testimony shows a collusive agreement between defendant Price and James L. Winter to procure the purchase of the Dell Bluff for their joint interest, by their suit against Bowden.

The following extracts from the testimony show conclusively that James L. Winter, the executor, was interested in the purchase of said lands :

"The Alachua tract was bid off for James L. Winter and myself by Henry Howell." Testimony of Haddock.

"Uriah Bowden bid off the Dell tract. I have heard Miles Price say that Bowden bid off the Dell Bluff tract for him (Price) and James L. Winter." Testimony of D. R. Howell.

"I think the title made was for the Dell Bluff property. My understanding was that Miles Price and James L. Winter bought the property, but Bowden was mixed up in it some way." Testimony of commissioner Hoeg.

"From what Miles Price told me, he (Price) and James

L. Winter bought the Dell Bluff place." Testimony of Miles Anthony.

"I bought the Alachua tract. I bid it off for James L. Winter, executor, and Joseph N. Haddock." Testimony of Henry Howell.

"I always understood that my husband and Miles Price bought the entire Winter tract in partnership. I am under the impression Mr. Price told me so much himself about. three or four weeks ago. In a conversation with Miles Price, he told me that he and my husband had bought the place together, and that he (Price) had paid a certain sum for it." Testimony of Teresa Winter, widow of James L. Winter.

"I understood, at the time, that Miles Price and James L. Winter were desirous of purchasing the Dell Bluff tract; that the executor could not be a bidder under his oath, and Uriah Bowden was the purchaser for Price and Winter. All the matters of said sale were arranged in accordance with such understanding, Colonel Sanderson, attorney of said estate, so advising." Emory's testimony.

Mr. Price, in his testimony, says: "I authorized Bowden to bid off the Dell Bluff tract for me. It was understood between me and Bowden that I was to be responsible for the purchase money;" but Price nowhere denies that J. L. Winter was joint purchaser with him. His attorneys did not venture to ask him the question.

The testimony of A. W. DaCosta, taken on behalf of the defendant, shows conclusively the interest of Winter, the executor, in the purchase of lands, as well as the collusion between him and Price to cheat and defraud the heirs for their joint benefit. He says that J. L. Winter "was present." (at the time and place of receiving quit-claim deed from the heirs,) "participating; he seemed to be engaged in bringing about the sale to Price by the heirs." Testimony of Da-Costa.

Von Santen, the guardian, was present at the same time,

and, in collusion with Winter and Price, made the illegal transfer of his ward's interest to Price. Testimony of Von Santen.

*Law of Actual and Constructive Fraud Applicable to Testimony Quoted.*

Fraud is defined to be any cunning, deception or artifice used to circumvent, cheat or deceive another. 1 Story Eq. Jr., § 186.

Implied or constructive fraud, indeed, properly includes all arts, omissions or concealments which involve a breach of legal or equitable duty, trust or confidence justly reposed, and are injurious to another. 1 Story Eq., § 187; 19 Barbour, 251.

Fraud may be collected and inferred from the nature and circumstances of the transaction as being a breach of trust or confidence, or imposition and deceit on another person. 1 Story Eq. Jr., § 188.

He that is voluntarily concerned in the commission of a fraud by another, shall never be permitted to obtain the benefit or profit thereof against those who have been defrauded. 1 Story Eq. Jr., § 423.

When Winter qualified as executor, he accepted the trust conferred by the will.

He violated that confidence by acting contrary to the express injunction of the testator and committed acts which involved a breach of legal and equitable duty to others, and, that, too, for his own private interest and profit.

1. The fraudulent interest is shown in the application for order of sale.

2. In the manner in which the application was prosecuted and conducted.

3. And also in the circumstances surrounding the sale and purchase, and the efforts to acquire titles.

The testimony to establish these propositions has been quoted above, and also authorities applicable to the two first.

We now proceed to the discussion of the law bearing upon the third proposition.

The purchase by a trustee or executor at his own sale is void, and it is immaterial whether purchase is made at public sale by another, or in the name of another as agent. Hill on Trustees, 159, 538 ; 3 Vesey, 678 ; 6 ib., 631.

The principle applies invariably to all who come within it. No party can be permitted to purchase an interest in property, and hold it for his own use, when he has a duty to perform in relation to such property inconsistent with the character of purchaser for his own use. Hill on Trustees, 159 ; 4 Cowen, 717 ; 4 Kent, 438 ; 6 Paige, 364 ; 12 Iredell, 73 ; 8 Wheaton, 441 ; 2 Sugden, 365.

By the policy of the law as administered in the courts of equity, the purchase was fraudulent and void, upon the ground that it was made by the intervention of a person (Bowden) who was a nominal buyer, and purchased for the executor for the purpose of conveying to him.

Such a transaction carries fraud on its face. 4 Howard, U. S., 553.

The rule stands upon the great moral obligation to refrain from placing ourselves in relations which ordinarily excite conflict between self-interest and integrity. Persons having a confidential relation, if permitted, might avail themselves of the information they would acquire for their own benefit. 4 Howard, U. S., 555.

It is contended by the appellant that the sale having been made by commissioners in the case, it does not come within the rule laid down in 4 Howard, Michoud et al. vs. Girard et al. In that case, there were two sales—one made by the parish judge—(see statement of the case, page 508)—the other made by a deputy register, (page 513.) The same point was made in that case by defendant's counsel, and not sustained. 4 Howard, record of case, 542.

The same rule applies when the sale is judicially made and

Price et al. v. Winter.

conducted by a Master in Equity.   9 Paige, 241 ; 3 Paige, 179 ; 4 Howard, 553.

The only way in which a person acting in a trust capacity can purchase at a sale of the trust property, is to procure an order of court authorizing the purchase.   Sugden on Vendors, 378 ; 3 Paige, 178 ; 4 Howard, 557.

The case in 2 Stewart Ala. Reports, referred to by defendants' counsel, has subsequently been overruled by the case quoted by us from 4 Howard.

The court, in that case, alludes to decisions made in some of the chancery courts of the United States, where it has been held that an executor may purchase, if without fraud, any property of his testator at open and public sale, and that such sale is only voidable, not void.  But, says the court, with all due respect for the learned judges who have so decided, we say that an executor and administrator is, in equity, a trustee for the next of kin, legatees and creditors, and that we have been unable to find any one well considered case to sustain the right of an executor to become the purchaser of the property which he represents, though he has done so for a fair price, without fraud, at a public sale. 4 Howard, 557.

The testimony shows that the sale was conducted solely by commissioner Emory, Hoeg not being present.

It is a well established rule that in the exercise of a public as well as a private authority, whether it be ministerial or judicial, all the persons to whom it is committed must confer and act together, unless there be a provision that a less number may proceed. 3 N. Y., 401 ; 21 Wend., 178.

The duties to be performed at a commissioners' sale are not exclusively ministerial.  The commissioners may employ an auctioneer to proclaim the sale and receive bids, but they must themselves determine when to commence the sale and how long it shall be kept open, and whether the sale shall be postponed.  These and other similar questions that may arise at the time of the sale, are so far judicial as to re-

quire the presence of both commissioners for determination. 3 N. Y., 407.

The sale of said lands was also void on account of further irregularities.

It appears from the advertisement of sale of the lands that no time and place was fixed for the sale by the commissioners. The sale having been made at public aution, notice of the time and place was necessary to secure competition by bidders, and to make the sale fair and legal. It does not appear from the record what was the date of sale. Neither the commissioners nor the purchasers complied with the order of court approving sale, and the deed was executed without authority, and consequently void. 8 Peters, 166–7.

If Price could hold under the commissioners' sale, it could only be in strict compliance with the terms of the sale and the order of court, and not by a speculation on the heirs by purchase of their interest at a discount. 8 Peters U. S., 146.

When he undertook the purchase of the claims of the heirs, he abandoned his right under commissioners' sale, (if he had any,) and in so far as commissioner Emory gave his aid and approval, he acted in violation of his duty and with collusion and fraud.

When the deed was executed to Bowden, the commissioners were "*functus officio.*"

About seven years previous, at the time of the confirmation of sale, it appears from the evidence that they executed a deed to Bowden, which they did not deliver, the purchaser not having complied with the terms of sale or order of court.

It is also in evidence that the terms of sale never have been complied with, and claims under the sale thereby abandoned by purchasers. Hoeg's testimony.

The sale appears to have been made in 1858. Commissioner Emory admits that it was not caried out in accordance with the order of court, and attributes the failure to the

war and the fact that he was carried North in 1863 ; but the sale should have been carried out long before the war.

The efforts made by Price and Winter, the executor, to buy up the interest of the heirs at a discount, will never satisfactorily account for the collusive delay in carrying out the decree of court.   Testimony of DaCosta.

*Confirmation.*—The attempted defence of confirmation is based upon circumstantial evidence and upon inferences, and not on direct and positive testimony, and is directly and persistently denied by the plaintiff, Winter.

Neither of the witnesses swear that the plaintiff (Winter) read the papers handed him by Price at his house, or that they were explained to him, and and the plaintiff swears that he did not read them sufficiently to get the purport of them ; that he did not know their contents.   Testimony of Winter.

Price swears that he told Winter that the bank stock was to pay for his interest in the real estate.  Winter swears " he did not tell me on what account it was coming to me, nor did I ask him.   Nobody there informed me, to my recollection, that these bonds were in payment of my share in the real estate.   My impression was that there had been money long years before deposited in the bank here for me, either from the hire of slaves or sale of perishable property.   If I had known it, I would not have taken it."   Testimony of Winter.

It is not shown either by the correspondence on the subject with his guardian, by the testimony of Von Santen or by the order for the money or stock, that the plaintiff was informed that the bank stock or bonds were the proceeds of the sale of his interest in the real estate to Price.   Neither the correspondence nor order allude to that sale.  See letters and order.

The fact that no allusion was made to the sale in the order of correspondence, and no receipt required from Winter,

confirms the want of knowledge in the plaintiff and supports his testimony.

The fact that the account between the guardian, Von Santen, and his ward had never been settled raises the presumption of a want of knowledge on the part of the plaintiff.

*Law on Confirmation.*—In equity, as long as a party injured does not know his rights to their full extent, any act done by him subsequently will not amount to a ratification or confirmation. 1 Story Eq. J., § 345 and note; 3 Howard U. S., 333.

The court will not permit transactions between guardian and ward to stand even when they occur after minority had ceased, when the time is short or when the accounts between them have not been fully settled, or the estate remains in some sort under the control of the guardian, unless the circumstances demonstrate in the highest sense of the terms the fullest deliberation on the part of the ward, and the most abundant good faith on the part of the guardian. 1 Story Eq. J., §§ 317, 323.

It is a general rule that whenever any contract or conveyance is void, either by positive law or upon principles of public policy, it is deemed incapable of confirmation. 1 Story Eq. J., § 306.

If confidence is reposed and that confidence abused, courts of equity will grant relief, and to establish the defence of confirmation in such cases, it lies upon the defendant, by distinct and explicit testimony, to bring home to the plaintiff the full knowledge of the facts. 19 Wend., 301; Hill on Trustees, 169; 1 Story Eq. J., § 308.

In the case of Michoud et al. vs. Girard et al., 4 Howard, 561, it was held that the receipts and acquittances given by two of the complainants to the executors do not affect their rights; they were obviously given without full knowledge of all the circumstances connected with the disposal and management of the estate.

When there is an allegation of fraud, the defence of con-

firmation will be watched with the utmost strictness. The general rule is, that whenever any contract or conveyance is *void on account of fraud*, it cannot be confirmed. Hill on Trustees, 538; 15 Johns. R., 585; 4 ib., 536.

WESTCOTT, J., delivered the opinion of the court.

James L. Winter, executor of the last will and testament of James Winter, deceased, filed his petition in the Circuit Court of Duval county, in the year 1857, alleging that the land which the testator directed should be divided between the devisees under the will could not be equally, fairly and beneficially divided. The parties interested in the estate were named defendants in the petition, and among them was the plaintiff in this cause, who was at that time an infant about eighteen years of age and a resident of the State of South Carolina. A sale was had under these proceedings, the order for the sale being dated the 22d of October, A. D. 1858. The defendants, Price, Howell and Hall, were purchasers at said sale and now claim interests in the land under the sale. No objection is urged in this action to the sufficiency of the petition in these proceedings.

The plaintiff Winter, through this action, seeks to set aside this sale upon several grounds. He insists that as to him the sale is void for two reasons:

First, Because the court did not have jurisdiction of his person; that he was served with no process; that, although he was a non-resident infant, no publication was made and that no guardian *ad litem* was appointed.

Second, Because the executor was interested in the bids by which the defendants acquired their interest in the land. Plaintiff also charges fraud and collusion between several parties to the proceedings, and also insists that there are such errors and irregularities in the proceedings as require the sale to be set aside in his behalf.

The irregularities complained of are that his statutory guardian, who was permitted to appear and represent him,

was of kin to the executor, being his brother-in-law ; that while two commissioners were appointed, only one was present conducting the sale; that no time and place was named in the advertisement for the sale by the commissioners, and other irregularites of like character.

We examine these questions stating the case as it appears from the petition and the proceedings for sale in the Circuit Court, and the record and the evidence in this action.

The question of jurisdiction and the alleged irregularities we consider first, as they can be more readily embraced under the same head.

It appears from the record of the proceedings that Frederick Von Santen, the statutory guardian of the plaintiff, acknowledged service of citation for the plaintiff, that he filed an answer alleging infancy, denying all the allegations in the petition, and submitting his interest to the court. Without any formal appointment of a guardian *ad litem*, the citation was served upon the statutory guardian who appeared and defended the action, putting in the defences required by the statute.

Two questions arise here. Was it necessary that the citation should have been served upon the infant ? If not, does not the appearance of the statutory guardian, his recognition by the court and his defence of the suit, constitute him a guardian *ad litem* without the formality of an appointment, and is this not sufficient under the statute to give jurisdiction ?

Let us understand precisely and accurately the nature of the subject which we are treating.

The Circuit Court in the proceedings for the sale was dealing with the estate of a deceased person and the inheritance of an infant. What were its powers in reference thereto ? Even admitting that in this proceeding the Judge of the Circuit Court was exercising chancery powers, which we think is not the case, as it is a special proceeding in which chancery powers are not brought into action; still

there is no doubt that all the power and jurisdiction which the court exercised in the matter of the sale of the infant's inheritance was derived from the legislative enactment. The inherent and original power of a court of chancery does not extend to a sale of the inheritance of an infant. Lord Hardwicke in 1750 said, "There is no instance of the courts binding the inheritance of an infant by any discretionary act of the court. That would be taking on the court a legislative authority, doing that which is properly the subject of a private bill." 2 Ves. Sr., 23 ; 6 Beav., 97 ; 10 Leigh, 421 ; 18 Gratt., 663 ; 6 Hill, 414 ; 4 Comst., 257 ; 3 Bland Ch'y, 186 ; 8 How., 556. We thus see that this is a proceeding within the control of the legislative department of the government. There is no doubt of its plenary power over the subject matter of the inheritance. It creates the right to the inheritance by enacting rules of descent, and gives as well as regulates the right of making testamentary dispositions. There is a paramount power in the government to direct in what manner the land of the decedent may be distributed, and if it be impracticable to make division in kind where a division is directed, it may sell the property and distribute the proceeds. Nor can it be doubted that the power exists in the Legislature to authorize the sale of an infant's interest in the estate of his ancestor *without notice* of the proceeding to the infant. This matter was discussed in the case of Florentine vs. Burton, 2 Wall., 210. In that case the administrator was authorized to sell at private sale with the approbation of the court. The act required no notice to be given, and in the record of the proceedings before the court there was no mention whatever that any notice had been given to heirs or to any person. The Supreme Court of the United States sustained the title of the purchaser and asserted that the Legislature had not exceeded its powers. See also 4 Scam., 134 ; 19 Texas, 369.

In proceedings under the statute it is thus apparent that a compliance with the enactment is sufficient. If the act

does not require notice to the infant, and prescribes any other method by which the court is to acquire jurisdiction of the person, then compliance with that method is all that is necessary, and while, in all cases, it is better to give notice to the infant or some near relative, still it is not essential if it is not required by the statute. The act in this State requires "the court to order citations to all the heirs or devisees *who are of full age,* and to the husbands of such as are *femmes covert* requiring them to appear upon a particular day mentioned therein at a regular or adjourned term of the court, not less than thirty days from the time of issuing such citations and answer said petition, and it shall be the duty of said court forthwith *to appoint guardians to such of the heirs or devisees as are infants* to answer and defend against said petition, which guardian shall not be the petitioner or of kin to the petitioner or his attorney or agent." The act provides further that "it shall be the duty of the guardian appointed as aforesaid to deny all the allegations contained in said petition without being verified by oath, and if necessary to employ counsel to defend his ward or wards." As to non-residence the statute provides "that if the petitioner shall make oath that any of the heirs or devisees are *of full age* and live beyond the limits of this State, or that their residence is unknown to the petitioner, a notice by advertisement' * * * shall be given." (The italics in these quotations are made by the court.)

To acquire jurisdiction of infants, whether they be resident or non-resident, the act requires the appointment of a *guardian ad litem.* To acquire jurisdiction of adults the act requires a citation to resident heirs and a notice by publication to non-resident heirs.

It is well in construing such statutes as this to trace their history. It is seldom that you cannot find in the older States statutes similar to these regulating such matters in the younger States, and if such statutes have, in the States from which they are derived, received a judicial construction, it is generally a safe plan to adopt that construction.

The act of 1841, in this State, (Thomp. Dig., 203 and 4,) under which the proceedings were had, was taken from the act of Alabama of 1822. (Clay's Ala. Dig., 224.) Under the decisions of the Supreme Court of that State, it is held that the proceeding under this statute is *in rem*, that the jurisdiction of the court attached upon the filing of a petition in which is alleged the existence of one of the statutory grounds of sale. (41 Ala., 39 ; 29 ib., 542, 210 ; 28 ib.; 215.) In a late case (41 Ala., 48) that court remarks, " the proceedings for the sale of decedents' lands are held by a long chain of decisions, not now to be questioned, to be *in rem*, and therefore the validity of the orders can never depend upon the fact that the court has acquired jurisdiction of the parties." We cannot go this far. We cannot hold that the validity of the orders under our statute can never depend upon the fact that the court has acquired jurisdiction of the parties. In the language of Mr. Justice. Bronson, (1 Hill, 139,) " it is necessary that the court should acquire jurisdiction over the person to be affected by the sale. The court must, either by serving process, publishing notice, appointing a guardian, or in some other way bring the party into court, and if judgment is rendered against him before that is done, the proceeding will be as utterly void as though the court had undertaken to act where the subject matter was not within its cognizance." In a subsequent case in New York, (2 Comstock, 463,) the case in which this language was used, was reviewed, and in view of the very great diversity of decisions upon this subject, we quote with approbation its commentary upon the only case which the Supreme Court of the United States in 2 How., 131, cites as sustaining the broad proposition that such proceedings are *in rem*, and no notice to parties is necessary. Of this case (11 Sergt. & Rawle) the Court of Appeals of New York remark : In this case " it was held that under the peculiar and exclusive power of the orphan's court, as a court of record, established by the Constitution, an order of

sale was of the nature of a proceeding in chancery, of which the petition of the administrator was the bill, and in which, by *act of the Assembly, he is the sole party representing the estate.*" Of the case in 2 How., 131, (which has been criticized with some severity—7 Rob. Pract., 86 to 89,) the only question we see about which there can be doubt, is its construction of the statute. If the statute required no notice to give jurisdiction of the infant, none was necessary, and if it did make this requirement, then it was necessary, and there was no jurisdiction of the person. Our conclusion upon this point is that personal service of citation upon the infant was not necessary, as the statute did not require it; that the statute required the appointment of a guardian to appear and represent the infant, and if the court did this it had jurisdiction of the person. The Supreme Court of Ohio (13 Ohio State, 506,) speaking of the necessity for personal service upon the infant, says : " It is enough that a guardian, either specially appointed for the purpose or having the care and custody of the infant's person and estate, was before the court when the order was made." (See also 18 Ohio S., 368 ; 15 ib., 689 ; 7 ib., 138, 198.) In this case it is unnecessary to consider the doctrine of presumptions as applicable to courts of inferior and limited jurisdiction. All that was done here as to service of process appears affirmatively upon the record, and, as to the matter of jurisdiction, the affirmations of a judicial record are verities, and presumptions should not and cannot reach to such an extent as to give jurisdiction of the person when all that was done appears affirmatively, and what was done does not show it.

The next question which arises is, was the infant in these proceedings for the sale represented by a *guardian ad litem ?* It appears from the record that F. Von Santen (who was the general guardian of the plaintiff) in the proceeding, by petition, acknowledged service of the citation for plaintiff, that he filed an answer alleging his infancy, and that in such answer he denied all the allegations of the petition, and that the court

in its action recognized him as guardian *ad litem*. In other words, he did all that the statute required, with the sanction of the court, but without any express appointment as guardian *ad litem* by the judge. This is sufficient. We find, after thorough examination of all the authorities within our reach, but two cases deciding this precise point, and they agree in the conclusion reached. In 2 Stewart, 214, the Supreme Court of Alabama declare and decide that where minors defendants have been permitted to make full defence by their general guardian, it will consider the sanction given to such mode of defence as equivalent to the formal appointment of a guardian *ad litem*. The court says that although not formally appointed guardian *ad litem*, such recognition is equivalent thereto. In Virginia, (6 Mon., 104,) where a suit against infants in chancery was defended by a guardian appointed by the county court, and his answer was received, and he made full defence and was recognized by the court, the Supreme Court held that the infants were as much bound as if their guardians had been appointed in form *ad litem* by the court of chancery. In the proceedings for the sale of this land, there was, therefore, jurisdiction of the subject matter and of the infant in the proceedings for the sale. This being the case, the matters complained of as irregularities and errors in the exercise of jurisdiction cannot be available in this action against a purchaser at the sale in the absence of fraud or for some like reason. This action is a collateral proceeding, not being in the same case and between other parties than those who were before the court in the proceedings for the sale. This action is essentially an equitable proceeding, and is equivalent to an original bill in the nature of a bill of review.

In Windham vs. Windham, 3 Chy. Reports, 12, an indirect attack was made upon a sale under the decree of a court of equity, whereupon the Lord Keeper remarked : " You blow up with gun powder the whole jurisdiction if such a purchaser is not protected."

More *et ux* vs. Neil *et al.*, 39 Ill., 262, was an original bill against the purchaser of an infant's interest at an administrator's sale of land. This bill, as in this case, sought to set aside the sale for want of jurisdiction as well as for errors and irregularities. The court having decided that there was jurisdiction, remarked : " This disposes of the case. Various other objections are made to the proceeding, but it is unnecessary to consider them, for at most these were but errors and cannot be urged against the title of these defendants. It is urged by the counsel for the plaintiff in error that this proceeding is not collateral. Perhaps it should not be so regarded, so far as relates to the parties to the former bill, but as to the defendants in this proceeding, whose title derived from the sale is sought to be divested, it is as purely collateral as an action of ejectment." 38 Ill., 108 ; 47 Ill., 290 ; 40 Miss., 142.

In Letcher vs. Letcher, 41 Ala., 39, the Supreme Court of that State, when asked to look into irregularities and errors attending a sale as against a purchaser, remarked : " We cannot assent to such a proposition. The maintenance of it would lead to consequences alike absurd and injurious. It would make a strict compliance with a large number of statutory requirements the unyielding standard of the validity of all orders of sale. Some of these requisitions pertain to matters not evidenced by the record. For example, a decree of sale would be void if the guardian *ad litem* was of kin to the administrator. One desiring to purchase at the sale would be unable to ascertain by an examination of the record and papers whether the title would be valid."

The purchaser need look no further than to see that the court has jurisdiction of the subject matter and parties. 47 Ill., 290 ; 11 Mass., 227 ; 1 Peters, 340 ; 2 ib., 168 ; 3 Ohio, 560 ; 4 ib., 159 ; 13 Ga., 10 ; 10 Peters, 475. In 3 Wall., 406, the Supreme Court of the United States was asked to look into the proof as to a fact in issue under the pleadings in a proceeding for a sale, the record of which was presented

in a collateral action. The court remarked that the matter did not touch the question of jurisdiction, and the action of the court was not open to consideration in a collateral matter. We have thus seen that the court had jurisdiction of the subject matter and the parties, and that there are no such irregularities in the sale as would authorize us to set it aside.

It is, however, insisted that the executor, Winter, was interested in the bid of Bowden with Miles Price, and that for this reason the sale was void. The testimony upon that question was substantially as follows : Emory, one of the commissioners, says that it was understood by him, at the time of the sale, that Miles Price and James Winter, who was the executor, were desirous of purchasing the Dell Bluff tract, that the executor could not be a bidder under his oath, and that Bowden was the purchaser for Price and Winter, and all the matters of said sale were arranged in accordance with such understanding, Col. J. P. Sanderson, the attorney for the estate, so counselling and advising. Hoeg, the other commissioner, says that it was his understanding that Miles Price and Winter bought the property. This, he says, was shortly after the sale and before the war. The understanding of the people or the common idea of a community as to who are interested in a sale cannot be accepted as a proper or legal method of establishing that fact. What may have occurred in the office of the attorney of the executor, and the understanding between the executor and his attorney, is no evidence against Price, and it does not appear that Price was at any time present. Howell states that he heard Price say that Bowden bid off the Dell Bluff tract for him (Price) and James L. Winter.

Anthony testifies that "from what Mr. Price told him, he (Price) and James L. Winter bought the Dell Bluff tract at the commissioners' sale." This is but the statement of the witness's own conclusion from his conversation with another.

His conclusions are not evidence. He should have stated what Mr. Price did say.

Teresa O. Winter, the widow of the executor, testifies that she was always under the impression that her husband and Miles Price had bought the entire Winter tract in partnership, and that in a recent conversation with Mr. Price, he told her that he and her husband had bought the tract together. It is thus seen that no witness testifies to what extent Winter was interested, and that the only testimony in the record as to this matter which is entitled to consideration is that of Anthony and of the widow of the executor. The testimony of the widow is that of an interested party.

Bowden, who bid off the land, testifies that he bid it off in his own name, but at the request of Price; that he looked to Price to make the payments; says he, "I considered the amount bid the full value of the land, and if I had not had as good a backer as Miles Price, I would not have bid that much for it. It was understood between me and him that he was to make the payments."

Miles Price testifies that he authorized Bowden to bid off the Dell Bluff tract for him; that he was responsible for the purchase money, and made the cash payment, and that he subsequently bought the interest of most of the other heirs. He nowhere testifies, however, that there was an understanding between him and the executor, or that the executor was to have an interest. It nowhere appears in the testimony to what extent Winter had an interest, and it does appear that everything that has been paid came from Price.

There is no person in the suit who represents the interests of Winter, the executor, if he had any, and, that he did have any interest, is certainly not a *very* *clear* conclusion from this testimony.

Admitting, however, for the purpose of disposing of this case, that he did have some unknown interest, what is the rule of equity applicable to the purchase of Price under such circumstances? It is insisted by the plaintiff that such

a sale was void and that Price acquired nothing thereby. All the earlier cases upon the subject of a purchase by a trustee of the property of a *cestui que* trust are reviewed by Chancellor Kent in the case of Davou vs. Fanning, 2 John. Chy., 257, and the conclusion there reached is that the court should set aside such a sale, although the property brought a fair price and there is no evidence of any actual fraud, in fact the sale may be at public auction and *bona fide* for a fair price and it makes no difference. I understand the rule as expressed to embrace every relation in which there may arise a conflict between the duty which the vendor owes to the person with whom he is dealing or on whose account he is acting and his own individual interest. Such sale is not, however, absolutely void, as all the cases upon the subject where the question is raised hold that the *cestui que* trust, after a re-exposure of the property to sale, and failure to obtain a better or an equal bid, has a right to hold the trustee to his purchase, and in all cases in which the sale is set aside, the trustee is entitled to be reimbursed, his money paid, interest and improvements. 2 John. Chy., 252; 20 Ohio, 503; 1 Ind., 565; 2 Black., 377; 14 Ohio State, 80; 5 John., 43. All this would be very well, perhaps, if this record established any interest in Winter and he was here represented; but it appears that Price made all the payments, so far as this proof is concerned, and we cannot see how this is applicable to his case. Price was no executor or trustee, and toward none of these parties did he occupy any fiduciary relation. In considering this question we must recollect that this principle, even as to the executor, is not a matter of absolute law. It is a rule of practice, a principle established by courts of equity with reference to persons occupying fiduciary relations. It is a *quasi* punishment of persons in such relations for permitting their interest to triumph in a transaction where their duty and interest clashed.

The whole doctrine arises from principles of public policy.

The purpose of the rule is fully accomplished when interests thus acquired by a trustee, agent or other person occupying like relations, are not permitted to stand.   It is sufficient to brand, under all circumstances, so far as such interests are concerned, such transactions as a legal fraud.   So far as Price is concerned he acquired his interest in this property as a purchaser at a judicial sale under an order of a court having jurisdiction of the subject matter and of the parties. He occupied no fiduciary relation.   The bid was for the full value of the land.   There was no fraud in fact connected with the sale.   Neither upon the grounds of public policy, nor upon any other principle obtaining in a court of equity, can we find a good reason for extending the rule to the interest of a person not clothed with any trust, when there is no fraud in fact, and when it appears affirmatively that full value was realized, and no other ground for setting the sale aside as to him exists, except the naked fact that the executor had an interest in the bid.   In this case the sale was by a commissioner and for full value.

It was insisted that there was fraud in fact upon the part of Miles Price.   This opinion is already too lengthy and we do not propose to state and review the testimony upon this subject.   We have carefully examined the entire testimony several times, and nothing can be found to justify such a conclusion.

The remaining questions raised in this case arise out of what has transpired since the sale.   At the sale, Uriah Bowden bid off what was known as the "Dell's Bluff tract" for $6,075—$3,000 to be paid in cash on the 1st of January, 1860, $1,537 50-100 on the 1st of January, 1861, and $1,537 50-100 on the 1st of January, 1862, the payments not made in cash to be secured by bond and mortgage.   Two forty-acre tracts were sold to Wm. J. Hall for $200—$67 to be paid in cash on the 1st of January, 1860, $61 50-100 on the 1st of January, 1861, and the balance on the 1st of January, 1862, the last two payments to be secured by

mortgage.  Six hundred acres were sold to Henry Howell for $2,300—$1,150 to be paid·in cash on January 1st, 1860, and the balance on the 1st of January, 1861, to be secured by mortgage.  The sale was reported, an order passed confirming the sale and directing deeds to be made to the purchasers upon the terms stated.  Bowden, who bid off the. Dell's Bluff tract, did not receive a deed for the·tract at the time of sale.  He states that he bid off the tract in his own name, but for Miles Price; that he was familiar with the value of lands in the county and he believed that the land brought its full value ; that it was understood between him and Price that Price was to make the payments and he relied on him to do it ; that the commissioners did not, prior to the war, tender him a deed, nor did they, at any time, ask for a mortgage ; that he received a deed for the property after the war.

C. L. Emory, the acting commissioner, testified that Miles Price paid him on the Dell's Bluff purchase $1,528, and that he paid this amount to the executor, James L. Winter. This payment, it appears, was made in July, 1860.  This sum was the amount due as cash after deducting the amount due to the wife of Miles Price from this sale and from the estate, she being a daughter of the testator and under the will entitled to a share.  No deed was executed at the time of the first payment, and no mortgage was given for the other sums due.  The war interrupted any further transactions between the parties, one of the commissioners for the greater portion of the time being North and the other parties South.  After the war, and in 1866, the commissioner Emory having returned in December, 1865, a deed was executed by·the commissioners conveying the land to Bowden, and Bowden subsequently executed a deed to Price.  There was no mortgage executed by Bowden or Price for any balance due.  As a reason for this, Emory, the commissioner, states that the relinquishment of all the heirs and distributees of the estate of James L. Winter or of their legal rep-

resentatives was exhibited to him before he executed the deed. It is unnecessary for the court in this case to do more than dispose of the questions raised by the plaintiff. Whatever interest others have need not be mentioned, and certainly this court cannot in their absence determine their rights. The interest which the plaintiff in this action had after the sale and confirmation and the deed, was his share of the proceeds of the sale. Price having made the cash payment to the commissioners, and having subsequently received a deed for the Dell's Bluff tract from Bowden, Bowden having before that time received a deed from the commissioners, Winter's interest did not extend beyond his share of the proceeds of this sale as well as his share of the amounts due by the other purchasers, Hall and Howell. Price insists that he had a settlement with the guardian of Winter for the amount due him on the Dell's Bluff purchase, and at the same time purchased of the guardian all of Winter's interest in the estate, including the eighty acres and the six hundred and forty acres. The guardian of Winter was authorized to receive from the executor such sums of money as was due his ward from the estate, and if that sum was paid by Price directly to the guardian, that was sufficient, so far as the ward was concerned.

In reference to the entire interest of Winter after the sale, Price insists that he paid his guardian the amount that was coming to him during his minority, and that since his majority he has had a full settlement with Winter, having paid him the amount due; that Winter, with a knowledge of the sale by the guardian and by the court, has received these sums with the knowledge that they represented his interest in the land derived from his father. If these are the facts, then it is clear that there is no case made by the plaintiff, not only as against Price, but as against the other defendants also. This is denied by the plaintiff. The determination of this question involves the consideration of

the testimony. The testimony having a bearing upon this subject is as follows :

Miles Price, the defendant—I agreed with the heirs to purchase their residuary interest at an estimated value, five hundred dollars. I got Mr. Jaudon to go to the probate office and ascertain what was due each heir. They had approached me and asked me to buy them out. I then paid them all except James L. Winter and Henry Jaudon. They accepted the payments and appeared satisfied. This is also the testimony of DaCosta. In the same way I purchased the plaintiff's interest from Von Santen his guardian. I paid Von Santen in Jacksonville and Columbia county bonds and by transfer of stock in the bank of St. Johns. I paid to Von Santen, as the representative of his wife, who had an equal interest with the plaintiff, the same amount I paid him as guardian and the representative of his ward, the amount being five hundred dollars in stock and bonds. These deeds of the guardian dated July 13th, 1861, purporting to transfer the interest of his ward in the land to Price, are in evidence.

It appears from the testimony that the plaintiff, after he had attained his majority and in the year 1863, came to Florida for the purpose of looking after his interest in his father's estate, and while there took charge of at least a portion of his negro property, receipting to his guardian. After the war, and in 1871, he moved to Florida.

The plaintiff testifies, " I have never had any settlement with my guardian. I demanded a settlement with him before I came. He gave me as a reason for not settling *that there was nothing for me*, that Sherman, when he came through Orangeburg, had destroyed all his papers." Notwithstanding this statement of the guardian, he believed he owed him for money received from his father's estate for the sale and hire of property coming to him under the will. This witness states, "I applied to Mr. Von Santen at the instance of Mr. Miles Price for an order on Mr. Miles Price

for bank stock, Mr. Price having informed me that there was some bank stock or bonds coming to me here, and if I would get an order from my guardian he would turn it over to me. *He did not tell me on what account it was coming to me, nor did I ask.* Mr. Price told me this at his residence. Mr. Price handed me some papers, some half dozen or over. He came out with a large batch of papers and put them on a bench. *I did not read them carefully. I may have glanced over some of them, but not sufficiently to get the purport of them, nor do I know their contents now.* Nobody then informed me, to my recollection, that these bonds were in payment of my share of the real estate. My impression was that there had been money long years before deposited in the bank here for me, either for the hire of slaves or the sale of perishable property. From my knowledge of the condition of the estate and the state of my accounts with my guardian, I would not have taken the bonds if I had known that they were in payment for my interest in the real estate." The following order appears in the testimony:

No. 29, KING STREET,
CHARLESTON, S. C., April 18, 1871.

Mr. Miles Price will please pay to Samuel A. Winter, Esq., the one-half of the net proceeds of the sale of the St. John's bank stock which he may have disposed of. Mr. Miles Price is hereby authorized by and with the consent of Mr. Samuel A. Winter to sell the bank stock to the best advantage he may think proper.        F. VON SANTEN.

Of this order, which was sent him by his former guardian by his written request, (see his letter in Von Santen's testimony,) he says : " I recognize this as the order sent me. It was inclosed in the following letter:

" CHARLESTON, S. C., April 18, 1871.
"*Mr. S. Winter, Jacksonville, Fla. :*

" DEAR SIR : Your letter of the 15th inst. is to hand. You seem to be surprised that Mr. Price had $1,000 worth of

Florida bank stock, which is our joint property. You may say that you should have had your portion long ago, but could you spare the two hundred and fifty dollars more than I could, but which Mr. Price had and laid out for us recently to make the bank stock somewhat good? I have written to Mr. Price in regard to this bank stock, which has so far been of no more benefit to me than it has been to you, and I am looking for his answer. In the meantime, I have no objection for Mr. Price to pay over to you whatever may be your portion out of the stock sold by him, and for this reason enclose you an order on him for it. *Before you left I told you* that I had sent the certificate of the bank stock to Mr. Price to see what he could get for it. I thought it had been burned with my other papers in Orangeburg by Sherman until I accidentally found it last fall.          *          *          *

"Your brother,                      *F. VON SANTEN."

"I had other reasons to believe that my guardian owed me. There were three or four receipts for negro hire given to James L. Winter, not accounted for to me, and I could find no account of them in the probate court. From 1860 I have been supporting myself and have been no charge to my guardian. *Before coming back to Florida, I knew nothing of the sale of the real estate of my father. I knew nothing that had transpired about it.* Since I came to Florida, I have in no way knowingly consented, assented or approved by word or act the sale or disposition of the real estate of my father, James Winter, deceased. As soon as I ascertained the condition of affairs in relation to my father's estate, I applied to counsel for legal advice and proceeded to seek my remedy by law."

Upon cross-examination, this witness states: "I sold the negro after I became of age in 1863, but turned over the money to Von Santen. The interview between me and Mr. Price was immediately after I came back to Florida in 1871, within about ten days after. I have no recollection of reading the papers then, *nor that Mr. Von Santen's name was*

*signed to them. I may have read the endorsements.* I did not read the papers through sufficiently to understand the purport of them. I was then thirty years old. Judge McLean examined the papers in the probate office subsequently to my receiving these bonds. I think I went there before that time. My object in going there was to examine Von Santen's accounts as my guardian. Judge McLean showed me his returns for two years, all that he had. They were for 1859 and 1860. I came to Florida on the seventh of April, 1871. I can't say whether I went out to the old homestead before I received the bonds. I know it was common repute before I received the bonds that Miles Price had possession of the Dell Bluff place and claimed title. I heard it from Mr. Jaudon and his wife and others ; and I also heard by repute that Price's title was not good. *I cannot swear that there was nothing said between Miles Price and myself in relation to the Dell Bluff place in our conversation.* ·I had understood that Brooklyn and Riverside were going up (these places were upon the land formerly known as the Dell Bluff tract) and had seen buildings there before I received the bonds from Mr. Price."

The endorsements on the four papers shown by Price to Winter were as follows :

Land title, F. Von Santen, guardian, to Miles Price.

Land title, Frederick Von Santen, guardian, of Samuel A. Winter, to Miles Price.

Land title, F. Von Santen to Miles Price.

Receipt of F. Von Santen and Samuel Winter of all due and coming from James Winter's estate, deceased.

There were three deeds executed by the guardian, one purporting to convey the interest in the Dell's Bluff, one the interest in the Alachua tract, and the other his interest in the eighty-acre tract. The paper endorsed " Receipt," &c., was a certificate setting forth that Von Santen, the guardian, had transferred to Price the entire interest of his ward in the property.

The testimony of Miles Price as to this transaction is as follows: "I had a conversation with the plaintiff at my house in 1870 or 1871, in relation to the bonds in the bank of St. Johns. It was in the piazza of my house; my wife was present." Speaking of the papers above mentioned, he says: "I showed him these papers and he looked over them; and I told him there were some Jacksonville and Columbia county bonds in the hands of Mr. Bours, and if he would get an order from Mr. Von Santen I would turn them over to him. He got the order, and I turned them over to him. I had bought the plaintiff's interest from his guardian, and I wanted to explain to him how he could get his pay, now he had become of age. *I told him these bonds were for the landed interest in his father's estate.*" The witness then states the particulars attending the transfer of the bonds, which it is unnecessary to insert, as the fact of the transfer is admitted.

The wife of Mr. Miles Price, who was present, testifies as to this matter as follows: "There was a conversation at our house between Miles Price and Samuel A. Winter, in relation to some bonds. They were sitting in the piazza. Mr. Price handed Winter a paper in writing, which paper Winter read in my presence. This was soon after he came to Florida after the war." Upon cross-examination the witness says: "Winter did not read the paper aloud. My husband said: 'Here, Sam, is a paper I got from Von Santen.' I think that there were other papers handed him at the same time. I do not recollect that any one else was present except Mr. Winter, Mr. Price and myself and the children. Mr. Price told Mr. Winter that Mr. Bours had the bonds, and if he would get an order from Von Santen he would hand them over to him."

Rhoda Jane Adams, who was present, tesifies as follows: "I was hired at Miles Price's at the time; was an employee of his. I saw Mr. Price give Mr. Winter some deeds, which he said was his landed property, and told him if he would

write to his guardian for an order he would return the bonds to him." Upon cross-examination, witness says : " I don't remember Mr. Winter's reply. I can't tell whether Mr. Winter read the deeds or not. He examined them and may have read them. The way I knew they were deeds I heard Mr. Price say so."

The testimony of Von Santen, so far as it has a bearing on the transaction, was as follows : He recites the sale and consideration made by him as guardian in July, 1861, which has already been stated, and denies the receipt of any money from his ward during the war. He gives the letter of Winter to him, requesting an order for the stock and bonds, which was as follows :

"JACKSONVILLE, Fla., April 15, 1871.

"*Mr. F. Von Santen, Charleston, S. C.:*

" MY DEAR SIR : Since my arrival here Mr. Price informs me that there is bank stock here to the amount of one thousand dollars, half of which is mine. Not long since he took up the said stock for you, having paid $250 for it. The situation in which I am now placed, being without any money at all, urges me to request you to send me an order on Mr. Price *for my portion*, which I should have had, by rights, long ago.  *    *    *    *    *    *    *

" Very truly yours,  S. A. WINTER."

" I replied to this letter and sent the order as desired. *Samuel Winter must have known before he came to Florida since the war, and before he received the bonds, that the lands of his father's estate had been sold, and that Miles Price had purchased the Dell Bluff tract. He has heard it from me and his sister Emma, my wife, in 1861, after the sale was made. He has heard it from me and his sister Emma at various times. He was told it by his sister Martha, now Mrs. Haddock, and Mr. Daniel Howell, in the winter of 1870, at my house.*"

Upon cross-examination, this witness says : " I had no settlement with my ward since his majority. I considered

him indebted to me, and I thought it was so understood by both parties. I made a full return of all my transactions as guardian, and my accounts were carefully examined and approved by the probate court."

If the plaintiff knew at the time he received these bonds and stock that they represented his share in the sums due by the various purchasers of the land, and was aware of the act of his guardian in executing the deeds, then he cannot now recover a part of the land or the proceeds of sale. Defendant's statement that the plaintiff knew that the stock and bonds represented his interest in the land is corroborated by the testimony of his wife, by the witness Adams and all the attending circumstances. The account given of the matter by plaintiff is entirely unreasonable. The conclusion from his statement is that he went to the defendant's residence; that while there some papers were shown; that he was told to get an order from his former guardian, and some stock and bonds would be given him, and that during the whole time he did not ask, nor did Price tell him, what all this was about, or intimate to him on what account and in what manner he was entitled to these moneys. The plaintiff says that Price did not tell him on what account the sum was due him, nor did he ask him. Winter was at the time thirty years of age, and a man, as his own testimony shows, of business experience. It is not probable that he would expect Price to be making him a present, nor did he have any reason to suppose that Price owed him anything except as the purchaser of this land; and this he knew, as he states that he knew that Price was in possession, claiming title; and Von Santen states that Winter was frequently told of Price's purchase by himself and by his (Winter's) sisters. In his letter to Von Santen he seems to have had some knowledge of the matter. He knows something as to the respective interests of his guardian and himself in this stock, and his language implies knowledge of at least the date to which he became entitled to his portion, as he says

he should have had it by rights long ago. Mrs. Price testi-
fies that plaintiff read the paper handed him by Price; and
the witness, Adams, states that he examined the deeds. The
plaintiff does not deny reading the deeds, but says: "I
may have glanced over some of them, but not sufficiently
to get the purport of them." He says, upon cross-examina-
tion: "I may have read the endorsements." The endorse-
ments are in a large, plain hand, and it was impossible for
him to have read them without knowing that they were in-
struments of writing from his guardian to the defendant.
One of the papers read by him was very brief, was written
in a very plain hand, and was as follows:

"STATE OF FLORIDA, ⎱
  "COUNTY OF DUVAL. ⎰

."Be it known to all whom it may concern, that I have this
day sold to Miles Price all my right, title, claim and interest
as an heir of James Winter, deceased, to the assets of said
estate, and also, I have, as guardian of Samuel A. Winter,
minor, sold his like claim and interest of said estate to Miles
Price.                          F. VON SANTEN.
  "Witness: Wm. Jandon, A. W. DaCosta."

In his cross-examination he says: "I cannot swear that
there was nothing said between Miles Price and myself in
relation to the Dell's Bluff place in our conversation. I
knew that Miles Price was in possession and claimed title,
and I had heard that his title was not good." He intimates
in his testimony that he thought his guardian owed him,
and the connection in which it is stated leaves it to be in-
ferred that he thought the stock was upon this account,
while in another part of his testimony he admits that his
former guardian had told him that he owed him nothing;
and his guardian swears that such was the understanding
between them. This would seem to be probable, as eight
years had passed since his majority, and no action had ever
been taken by him against his guardian. In no event would

the plaintiff have been entitled to compensation for the increased value of these lands. His right after the sale was limited to the proceeds. The purchasers were entitled to deeds upon making the cash payment. His share of them he and his guardian have received, knowing that what he received represented his interest. If this is not a full settlement, which we think it is, Winter is now certainly estopped from demanding the lands. The cases upon the subject are certainly as strong, if not stronger, than this. (7 S. & M., 409 ; 4 Ind., 259 ; 26 Ala., 452; 2 Rich., 153 ; 19 Ill., 298; 53 Pen. State, 352 ; 1 Rawle, 163 ; 7 W. & S., 127 ; 7 Harr., 424 ; 1 Casey, 282.) With this conclusion a court of equity must regard Price as the owner of all the interest of the plaintiff in the landed estate of his father, and for that reason there can be no equity in favor of the plaintiff against defendants Hall and Howell, the other purchasers at the sale.

This disposes of all the questions in the case.  Judgment reversed.

The judgment of the Circuit Court should have been for the defendants, and the case is remanded with instructions to enter such judgment.